**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RICHARD PAUL SMITH,
individually and on behalf of
others similarly situated,

      Plaintiff,

v.

      Case No. 8:25-cv-2300-KKM-NHA

VERRA MOBILITY
CORPORATION et al.,

      Defendants.

_____

## **ORDER**

Richard Smith brings this putative class action against Verra Mobility Corporation, the School Board of Polk County, Florida, and the Polk County Sheriff's Office, alleging that the defendants' automated school-bus traffic enforcement system violated his state and federal constitutional rights, unjustly enriched the defendants, and violated Florida's consumer protection laws. *See* Compl. (Doc. 1). Each defendant moves to dismiss Smith's claims against them. For the reasons stated below, I grant the Sheriff's Office's motion to dismiss in full, and I grant in part and deny in part Verra's motion and the School Board's motion.

## I.    BACKGROUND

Florida law prohibits motorists from passing a school bus once the school bus displays a stop signal. *See* Compl. ¶ 11 (citing § 316.172(1)(a), Fla. Stat.). A violation of Section 316.172(a) constitutes a "moving violation," which is a noncriminal traffic infraction punishable by a civil penalty. *Id.* §§ 316.172(1)(a), 318.14(1) (2026).

In 2023, the Florida legislature amended the Mark Wandall Traffic Safety Act to authorize school districts "to contract with a private vendor or manufacturer to install a school bus infraction detection system on any school bus within its fleet . . . for the sole purpose of improving public safety." *Id.* ¶ 12 (citing § 316.173, Fla. Stat.). Under the permitted contracting scheme, the school district or vendor sends videos of alleged infractions to law enforcement. *See* § 316.173(4) (2024), West's Fla. Stat. Ann. (amended 2025).[1] If the law enforcement agency determines that a violation of Section 316.172 has occurred, the agency must "send a notice of violation [NOV] to the registered owner of the motor vehicle involved in the violation specifying the remedies available . . . and that the violator must pay the [$225 statutory] penalty . . . or furnish an affidavit . . . within 30 days after the notice of violation is sent in

---

[1] Unless otherwise noted, citations to this provision of the Florida Statutes are from West's Florida Statutes Annotated (2024), which was effective between July 1, 2024, and June 18, 2025.

order to avoid court fees, costs, and the issuance of a uniform traffic citation." *Id.* § 316.173(5). Specifically, the NOV must include "[i]nstructions on how to request a hearing to contest liability or the notice of violation." *Id.* § 316.173(5)(d).

If an NOV recipient fails to either pay the $225 penalty or submit an affidavit contesting liability within thirty days, a uniform traffic citation (UTC) will be issued. *Id.* § 316.173(5)(g); Compl. ¶ 2. If so, "[a] court that has jurisdiction over traffic violations shall determine whether a violation of this section has occurred. . . . by a preponderance of the evidence." § 316.173(5)(g), Fla. Stat. If a court upholds the NOV, it "must require the petitioner to pay the penalty previously assessed" and "may also require the petitioner to pay costs." *Id.*; *see also id.* § 318.18(5)(a)(2).

In April 2024, Verra Mobility Corporation entered a "Photo Enforcement Service Agreement" with the Polk County School Board, "authorizing the enforcement of school bus stop signal violations and allowing for revenue generation from citations issued through the CrossingGuard System." Compl. ¶ 22. The School Board then entered into an intergovernmental agreement with the Sheriff's Office, "to provide law enforcement resources necessary to administer traffic enforcement and violation assessment for the CrossingGuard System, and to 'prosecute violations.'" *Id.* ¶ 23. "The CrossingGuard System works by activating cameras installed on school buses

3

when the stop lights are activated and recording the license plate of vehicles passing in the opposite direction using video and still photographs." *Id.* ¶ 25. Verra sends the video to the Sheriff's Office, which reviews it determine whether an infraction occurred. *Id.* ¶¶ 26–27. If the Sheriff's Office determines a violation has occurred, an NOV is sent to the vehicle's registered owner. *Id.* ¶ 28. Since the program's inception, the defendants "ha[ve] issued over 11,400 NOVs to drivers in Polk County, Florida, generating an estimated $1.3 million in receivable civil penalty revenue." *Id.* ¶ 30. Verra receives 60% of the program revenue; the School Board receives 30%; and the Sheriff's Office receives the remaining 10%. *See id.* ¶ 34.

In February 2025, the Sheriff's Office issued Richard Smith an NOV alleging a violation of Section 316.172(1) for failing to stop for a school bus displaying a stop sign. *See* NOV (Doc. 33-1). As required, the NOV included the signature of a law enforcement officer, the date, time, location, and images of the alleged infraction, as well as a web link to view the images and to pay on Verra's website. *See id.* at 1. The NOV lists the amount due as $225 and explains that "[n]o points will be assessed for this Notice of Violation, nor will it affect vehicle insurance rates." *Id.* There is no option to request a hearing to contest the NOV. Instead, the NOV provides two options: pay by the due date

or submit an affidavit establishing one of four statutory exemptions.[2] *See id.* at 1–2. If the recipient does neither, he will be issued a UTC:

> Upon issuance of a UTC, you shall have the remedies specified in Florida Statute § 316.173, which include (a) the right to pay the civil penalty in the amount of $329.00; (b) the right to submit an affidavit; or (c) the right to have a hearing before a designated official, who shall determine whether an infraction has been committed. If the official concludes that no infraction has been committed, the UTC will be dismissed, and no costs or penalties shall be imposed. If the official concludes an infraction has been committed, the official will uphold the UTC and may impose an additional civil penalty not to exceed $500.00 and court fees and costs. Failure to pay, submit an affidavit, or request a hearing on the UTC could result in your driving privileges being suspended.

*Id.* Believing the NOV was improperly issued, Smith declined to pay the civil penalty and received a UTC. *See* Compl. ¶¶ 51–52. Smith requested a hearing on the UTC, where he "was found guilty." *Id.* ¶ 53. The court "assessed a $198.00 fine, a $7.00 additional fine, and $131.00 in court costs," for a total of $336, which Smith timely paid. *Id.* ¶ 53. Smith did not appeal the decision. *See id.*

In May 2025, the Florida legislature amended Section 316.173 to provide for administrative hearings at the NOV stage. *See id.* ¶ 45. The amended statute requires an NOV to explain that a recipient may "request an

---

[2] An alleged violator may establish one of four exemptions: (1) the vehicle was being driven by someone other than the registered owner; (2) a UTC was issued by law enforcement at the time and place of the violation; (3) the vehicle's owner was deceased on or before the date the violation was issued; or (4) the vehicle was stolen. *See* § 316.173(9)(a)–(d), Fla. Stat.; *see also* NOV at 2.

administrative hearing with the school district or county, as applicable, within 60 days after the notice of violation is sent in order to avoid court fees, costs, and the issuance of a [UTC]." § 316.173(5), Fla. Stat. (2025); *see id.* § 316.173(6) (outlining the appointment of hearing officers and procedures for NOV hearings). The new law applies prospectively, and, according to Smith, "provid[es] no remedy for individuals fined under the earlier version of the statute." Compl. ¶¶ 45–47.

Accordingly, Smith brings this putative class action on behalf of himself and "[a]ll persons who received a NOV through the CrossingGuard System between April 2, 2024 and the present and paid the associated civil penalty." Compl. ¶ 55. Smith sues Verra, the School Board, and the Sheriff's Office under 42 U.S.C. § 1983, alleging that the defendants violated his rights to procedural due process under the Fourteenth Amendment and the Florida Constitution by issuing an NOV that he could not contest without subjecting himself to further UTC penalties. *See id.* ¶¶ 73–101 (Counts I and II). According to Smith, the defendants "affirmatively exploited the statutory gap" that did not require hearings at the NOV stage, thereby "coerc[ing] payments from drivers under threat of escalating penalties and license suspension" in UTC proceedings. *Id.* ¶¶ 20–21. Smith also brings claims against all three defendants for unjust enrichment, *id.* ¶¶ 102–06 (Count III) and declaratory relief, *id.* ¶¶ 107–14

(Count IV), and violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) against Verra only, *id.* ¶¶ 115–26 (Count V).

Each defendant moves to dismiss Smith's complaint, *see* Sheriff's Office MTD (Doc. 30); School Board MTD (Doc. 31); and Verra MTD (Doc. 33), and Smith responds in opposition, Resp. (Doc. 46).

## II.    LEGAL STANDARDS

A claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8. This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Nor do "naked assertion[s]" devoid of "further factual enhancement" suffice. *Twombly*, 550 U.S. at 557.

"To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept the complaint's factual allegations as true and construe

them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. 544.

## III.   ANALYSIS

The defendants move to dismiss each count in Smith's complaint for failure to state a claim, arguing primarily that the CrossingGuard System and the resulting NOVs provide violators with sufficient notice and process. The defendants also maintain that Smith fails to state claims for unjust enrichment or for a violation of FDUTPA. Before I address the defendants' substantive arguments on their terms, I turn first to the Sheriff's Office's contention that Smith filed a shotgun pleading and lacks standing, and then to all three defendants' threshold argument that Smith lacks standing to pursue his claim for declaratory relief.

### A. Shotgun Pleading

At the outset, the Sheriff's Office contends that Smith's complaint is a shotgun pleading because he "lump[s] each of the Defendants together in all but the FDUTPA claim and has failed to identify which of them took which allegedly unconstitutional actions." Sheriff's Office MTD at 4–5. Not so. "The

8

fact that defendants are accused collectively does not render the complaint deficient" so long as "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct," such that each defendant has notice of the claims against him. *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000); *accord Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins.*, 953 F.3d 707, 733 (11th Cir. 2020). At times Smith's complaint does as much, and at other points Smith's complaint fairly alleges discrete actions by each defendant. With respect to the Sheriff's Office specifically, Smith alleges that it "purportedly reviews the recorded images after the transmission of data indicating a potential traffic violation to determine whether an infraction occurred," sends the NOVs, and then recovers "approximately 10%" of the payments received. *See* Compl. ¶¶ 26–28, 34. The Sheriff's Office has sufficient notice of the claims against it.

### B. Article III Standing

Next, the Sheriff's Office argues that Smith lacks standing to raise his constitutional claims because he "challenges the process itself – not the statute," and thus has not alleged a cognizable injury. Sheriff's Office MTD at 6. And even if Smith alleged an injury, the Sheriff's Office contests traceability, claiming that Smith fails to allege "that the Sheriff developed the Polk Infraction System hearing process or that the Sheriff is responsible for preventing the application of a different process." *Id.* at 7. Smith responds that

9

he "is not alleging an abstract process injury," but instead that "he availed himself of the only contestation process Defendants made available and that this process caused him concrete additional harm." Resp. at 5–6.

### 1. Due Process Claim

To establish standing, a plaintiff must show "(1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision." *L.M.P. on behalf of E.P. v. Sch. Bd. of Broward Cty.*, 879 F.3d 1274, 1281 (11th Cir. 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[A]t the pleading stage, a plaintiff must clearly allege facts demonstrating each element" for each claim. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified). Standing requirements apply no less in class actions, where "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id.* at n.6 (citation modified).

The Sheriff's Office's standing argument relies heavily on *Worthy v. City of Phenix City*, in which the Eleventh Circuit considered the plaintiffs' standing to challenge a local ordinance's red-light traffic camera enforcement process. 930 F.3d 1206 (11th Cir. 2019). There, the parties agreed that the plaintiffs suffered an injury when they received civil penalties for red-light violations,

and that a favorable decision would redress the injury, but disagreed as to causation because the plaintiffs "fail[ed] to fully utilize the allegedly unconstitutional procedures provided in the ordinance." *Id.* at 1214. The court construed the plaintiffs' complaint broadly "as a challenge to the constitutionality of the ordinance as a whole," which argued "that the ordinance itself is constitutionally deficient as a whole because of the procedures—or lack thereof—that it provides." *Id.* On that view, "there is a causal connection between the ordinance and [the alleged] injury," namely "the civil penalty assessed against [the plaintiffs] under the ordinance." *Id.* at 1215.

Similar logic applies here. Although Smith challenges "the procedures" that the defendants' scheme "provides," *id.*, he also alleges "a separate, additional injury: the escalated penalties, fees, and UTC he was forced to accept as the price of contesting liability under a process Defendants created outside [Section 316.173's] framework," Resp. at 5. Smith used the available procedures, and he fairly alleges that those procedures led to, and in fact increased, the ultimate civil penalty he paid. *See, e.g.*, Compl. ¶ 99 (alleging that Smith was "denied a fair and timely opportunity to challenge the alleged infraction before being subjected to increased penalties and [a] coercive enforcement mechanism"). Likewise, Smith sufficiently alleges that the injury is traceable to the Sheriff's Office as part of its intragovernmental agreement with the School Board. The Sheriff's Office "administer[s] the Program" by

"review[ing] the recorded images . . . to determine whether an infraction occurred," *id.* ¶¶ 26–27, and one of its law enforcement officers signed the NOV issued to Smith, *see* NOV; *see also* § 316.173(5), Fla. Stat. (explaining that, if a violation occurs, "the law enforcement agency must . . . send a notice of violation to the registered owner of the motor vehicle involved in the violation specifying the remedies available . . . ."). Smith has standing to pursue his due process claim against the Sheriff's Office.

### 2. Declaratory Relief

All three defendants contend that Smith lacks standing to bring a claim for declaratory relief "because he cannot plead a likelihood of future injury." Sheriff's Office MTD at 7; *see* School Board MTD at 10 ("[Smith] lacks Article III standing to pursue declaratory or injunctive relief because the Complaint challenges only a completed, past enforcement action and alleges no facts showing a real and immediate threat that [Smith] will suffer the same alleged injury again."); *see also* Verra MTD at 23–24. Smith disagrees, responding that the "future-injury requirement applies only to a plaintiff 'seeking declaratory relief without a claim for money damages for injuries already suffered.' " Resp. at 7 (quoting *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1215 (11th Cir. 2019)). Smith overreads *A&M Gerber*'s purported limitation.

As a starting point, "[i]n all cases arising under the Declaratory Judgment Act, . . . the threshold question is whether a justiciable controversy exists." *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995). "That is, under the facts alleged, there must be a substantial continuing controversy between parties having adverse legal interests." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) (citing 28 U.S.C. § 2201). "In order to demonstrate that there is a case or controversy that satisfies Article III's standing requirement when a plaintiff is seeking declaratory relief—as opposed to seeking damages for past harm—the plaintiff must allege facts from which it appears that there is a substantial likelihood that he will suffer injury in the future." *A&M Gerber*, 925 F.3d at 1210–11 (citation modified). Accordingly, any standalone claim for declaratory relief must allege a "future injury." *See id.* at 1215; *see also Regency of Palm Beach, Inc. v. QBE Ins. Corp.*, 2009 WL 2729954, at \*4 (S.D. Fla. Aug. 25, 2009) ("The point of a declaratory judgment is to permit actual controversies to be settled before they ripen into violations of law, not to adjudicate past conduct.") (citation modified).

Here, Smith argues that his "declaratory relief count is not a freestanding claim" but is instead "tethered to and in service of live damages claims arising from injuries [he] has already sustained."[3] Resp. at 7. Smith

---

[3] To the extent that Smith argues his claim for declaratory relief is "in service of live damages claims," Resp. at 7, he concedes that the declaration he seeks is congruent

argues that *A&M Gerber* permits declaratory relief alongside a claim for money damages for past harm. *See id.* As the Supreme Court has explained, however, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). *A&M Gerber* is not to the contrary, and thus although Smith seeks money damages, Smith "has standing to seek declaratory relief only when 'there is a substantial likelihood that he will suffer injury in the future.'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266 (11th Cir. 2024) (quoting *A&M Gerber*, 925 F.3d at 1210–11), *cert. denied*, 146 S. Ct. 607 (2025). His damages claim for past constitutional violations cannot fill the gap. *Cf. Reed v. Waters*, No. 3:24-CV-463-MMH-SJH, 2024 WL 4529253, at *12 n.16 (M.D. Fla. Oct. 18, 2024) ("Just

---

with his claims in Counts I and II that the defendants violated his federal and state constitutional procedural due process rights. Although Smith tries to argue that "[a] declaration that the scheme and procedures were unlawful would . . . clarify[] the parties' present legal relations and the validity of the assessments and collections at issue," Resp. at 31, he does not explain how that clarification would possibly add anything to a judgment in his favor on Counts I or II. Accordingly, even if Smith's theory of standing were correct, I would exercise my discretion to dismiss Count V as duplicative of the constitutional claims. *See, e.g., Persaud Props. FL Invs., LLC v. Town of Fort Myers Beach*, 593 F. Supp. 3d 1129, 1144 (M.D. Fla. 2022) ("Declaratory relief is purely discretionary, and courts have the power to dismiss a claim for declaratory relief where it is duplicative of claims asserted in a lawsuit.") (quoting *Roy v. City of Monroe*, No. 16-1018, 2018 WL 4120013 (W.D. La. Aug. 29, 2018)).

14

because nominal damages can provide redress for past injuries, it does not follow that declaratory judgment can do so also.").

Here, Smith does not sufficiently allege risk of future injury from the defendants' CrossingGuard System or the purportedly deficient NOVs. The complaint hints that the "controversy is ongoing and affects . . . individuals who continue to face exposure to the same enforcement practices," Compl. ¶ 112, but Smith acknowledges that Florida has amended the relevant statute to require municipalities to provide a mechanism to immediately challenge an NOV at a hearing, "the very safeguard [Smith] contend[s] was previously missing," *id*. ¶ 45. Smith does not allege that he or anyone else will violate the statute and receive a purportedly deficient NOV. Accordingly, absent any risk of future harm, Smith has no standing for declaratory relief.

### C. Procedural Due Process

Smith's complaint principally alleges that the defendants violated his right to procedural due process by issuing an NOV with a $225 fine that he could not contest before it lapsed into a UTC, thereby triggering higher monetary penalties and risks to his driving privileges. *See* Compl. ¶¶ 73–101. And although Smith could (and did) receive a hearing on the UTC, he argues "[t]hat structure—demanding immediate payment while offering no visible path to contest liability without triggering an escalation of penalties, court costs, and license suspension for contesting the NOV—had a chilling effect on

15

the willingness of vehicle owners to exercise their right to be heard." Resp. at 2. The defendants disagree with Smith's characterization, responding that he received all protection due given his marginal property interest in a relatively small fine. *See, e.g.*, Verra MTD at 10–13. Properly construed, Smith's allegations fail to state a constitutional violation of due process.

"[D]ue process is flexible," and the procedures required to satisfy the Constitution vary according to the demands of the situation. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Under the Fourteenth Amendment to the United States Constitution, procedural due process requires adequate notice and a meaningful "opportunity to be heard."[4] *See Mathews v. Eldridge*, 424 U.S. 319, 333, 348–49 (1976). "[P]rocedural due process violations do not become complete 'unless and until the state refuses to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir. 1994) (quoting *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)), *abrogation on other grounds recognized by Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F. 1232, 1240 (2025). To survive a

---

[4] Although the Florida Constitution applies the same due process standard as federal law, *see Mod., Inc. v. Fla. Dep't of Transp.*, 381 F. Supp. 2d 1331, 1346 n. 26 (M.D. Fla. 2004), Smith's state law claim is subject to dismissal "because [Section] 1983 protects only rights secured by federal law," *Perez v. Sch. Bd. of Miami-Dade County*, 917 F. Supp. 2d 1261, 1266 (S.D. Fla. 2013). There is no state-law analogue to Section 1983 for alleged violations of the Florida Constitution. *Youngblood v. Fla. Dept. of Health*, 224 F. App'x 909, 913 n. 4 (11th Cir. 2007) (per curiam); *see Corbett v. Transp. Sec. Admin.*, 968 F. Supp. 2d 1171, 1191 (S.D. Fla. 2012) ("In Florida, no cause of action exists for money damages for a violation of a state constitutional right.") (citation modified).

motion to dismiss, a plaintiff must allege the (1) "deprivation of a constitutionally-protected property interest" (2) by state action (3) through a "constitutionally[] inadequate process." *See Spencer v. Benison*, 5 F.4th 1222, 1232 (11th Cir. 2021). The dispute here turns mainly on the third prong, the constitutional adequacy of a particular process, which is measured by balancing (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. I address each factor in turn.

### 1. Private Interest

To begin, the defendants do not contest that Smith has a private property interest in a monetary assessment and his license privileges. *Compare* Sheriff's Office MTD at 9–10, *and* School Board MTD at 3–4, *with* Resp. at 9–10. Only Verra argues that "numerous courts have held that small fines do not trigger federal due process protections." Verra MTD at 9 (collecting cases). But Verra confuses Smith's claim as one for violation of substantive due process, which concerns whether the protected interest is a fundamental right. On Smith's procedural due process claim, the threshold is lower. Smith has a property

17

interest in his money, as well as his driver's license and driving privileges, and so some process must attach to the deprivation of either. *See, e.g.*, *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1327 (11th Cir. 2023) ("[A] due-process right attaches to the imposition of civil or administrative penalties."); *Evans v. Rhodes*, 735 F. App'x 986, 988 (11th Cir. 2018) (per curiam) ("A driver's license is a constitutionally-protected property interest.") (citing *Dixon v. Love*, 431 U.S. 105, 112 (1977)).

Looking to Eleventh Circuit precedent, the magnitude of Smith's property interests here is relatively small when balanced against the low risk of error, the public safety interest at stake, and the cost of additional procedures. That remains true even considering the "escalating" penalties Smith faced in contesting the UTC. *See* Compl. ¶ 21. Per the controlling statute, the defendants' NOV could assess only a $225 civil penalty, the most relevant property interest here. *See* § 316.173(5), Fla. Stat. The NOV is not recorded on a driver's driving record. When Smith declined to pay the NOV, his penalty exposure increased to $329, with a maximum additional civil penalty of $500 plus court costs and fees if found responsible after a hearing. *See* Resp. at 9; *see also* NOV at 2. To be sure, "[f]ailure to pay, submit an affidavit, or request a hearing on the UTC could result in [Smith's] driving privileges being suspended." NOV at 2. But absent Smith declining to pay the

18

NOV and the Sheriff's Office issuing Smith a UTC, the defendants could not (and did not) mandate payment or restrict Smith's driving privileges.

Courts have described similar civil penalties as "relatively minor" for Fourteenth Amendment purposes. *See Bevis v. City of New Orleans*, 686 F.3d 277, 280 (5th Cir. 2012) ("In this [automated traffic enforcement] case, the maximum fine is the relatively minor amount of $380, or $455 if the payment is overdue."); *Yagman v. Garcetti*, 852 F.3d 859, 865 (9th Cir. 2017) ("[T]he private interest at stake is relatively modest. Any erroneous deprivation based on the City's prehearing deposit requirement is temporary, as the deposit is refunded after a successful challenge."); *Parker v. Am. Traffic Sols., Inc.*, No. 14-CIV-24010, 2015 WL 4755175, at *5 (S.D. Fla. Aug. 10, 2015) (describing the interest in contesting a $158 citation for running a red light as "marginal"); *cf. Evans*, 735 Fed. App'x at 989 ("[T]he property interest of which [the plaintiff] was deprived when the Department suspended his license was not so essential as to require a pre-suspension evidentiary hearing."). In *Worthy*, for example, the Eleventh Circuit described similar property interests as "slight." 930 F.3d at 1223. The red-light infraction system at issue there imposed an initial $100 civil penalty, which—like the NOV here—was "not reported on the driver's driving record." *Id.* at 1212.

Smith resists this conclusion, arguing that *Worthy* found the interest only "slight" because "[a] citation recipient d[id] not have to pay anything to

challenge the citation at an administrative hearing." Resp. at 11 (quoting *Worthy*, 930 F.3d at 1223). That is only partially true. Though a citation recipient could contest the initial civil penalty via an administrative hearing, doing so was not costless: if the driver was found liable, "an additional $25.00 fee is assessed." *Id.* "And though it costs $279.00 to appeal to circuit court . . . that fee is refundable if the citation recipient ultimately prevails. Accordingly, the only potentially erroneous deprivation that must be suffered to invoke the procedures provided in the ordinance is a modest, temporary filing fee. This is not a significant private interest." *Id.* at 1223. Although the procedures afforded Smith differ slightly from those in *Worthy*, the property interest does not. In both cases, violating Florida traffic law yields a modest fine that is ultimately contestable, albeit with some additional risk if the violator is found liable *after* a hearing.

Viewed that way, Smith's property interest looks equally minimal. Although Smith's *potential* penalties—and in turn, his property interest— increased when he declined to pay the $225 NOV, Smith did not have to pay a deposit to contest the UTC or to appeal an unfavorable hearing decision. The risk of further penalties does not elevate Smith's initial property interest, especially in view of the later-available procedures. *See Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 840 (E.D. Va. 2015) (explaining that an "opportunity to be heard is sufficient to comport with procedural due process"

20

even if higher "civil penalties and fees . . . attach to such a right"). And, like in *Worthy*, had Smith been successful at either stage, he does not allege that he would have been responsible for driving penalties—or *any* penalties—for that matter. *See* § 316.173(5)(g), Fla. Stat. (2024) (providing only that the court may require payment of the penalty "[i]f the notice of violation is upheld"). All told, then, Smith's property interest at stake in paying the civil penalty associated with the NOV is relatively modest.

### 2.  Risk of Erroneous Deprivation

Turning to the second *Mathews* factor, the risk of erroneous deprivation proves minimal because Smith received notice that he was able to contest the underlying infraction in UTC proceedings, which provided a full hearing. Although the parties dispute the costs and benefits of additional safeguards, Smith fails to sufficiently allege that further safeguards would decrease the risk of erroneous traffic citations.

To start, Smith fairly argues that, "[i]n Polk County, there was no hearing, no burden of proof, and no review of any kind at the NOV stage." Resp. at 13. That point is uncontested. But the defendants counter that the later procedures minimized the risk of wrongful deprivation at the NOV stage. *See, e.g.*, School Board MTD at 3–4 ("The risk of erroneous deprivation is low, where, as here, [Smith] received an adversarial hearing and litigated the citation on the merits."). According to Smith, though, the risk "is not merely

that a vehicle owner might be wrongly found liable," but "that any vehicle owner who wished to contest liability would first be subjected to escalated penalties, court costs, and a formal UTC." Resp. at 13. Smith's position skews the balancing inquiry and ignores that "the state may cure a procedural deprivation by providing a later procedural remedy." *McKinney*, 20 F.3d at 1557.

In assessing the risk of erroneous deprivation, courts review "the risk that the procedures employed may result in an erroneous deprivation of the private interest and the probable value, if any, of additional or substitute procedural safeguards." *United States v. 408 Peyton Rd., S.W.*, 162 F.3d 644, 650 (11th Cir. 1998) (en banc) (citing *Mathews*, 424 U.S. at 335), *superseded by statute on other grounds*, Civil Asset Forfeiture Reform Act of 2000, *as recognized in United States v. Bowman*, 341 F.3d 1228, 1235 (11th Cir. 2003).

Of course, Smith and the putative class have an interest in not paying erroneous traffic citations. But I do not read Smith's complaint to "allege[] that additional procedures would reduce the risk of unwarranted traffic citations because [he] do[es] not allege that any . . . tickets were issued in error, or that the [potential class members] might have been able to prove that those tickets were issued in error with the aid of formal proceedings." *Parker*, 2015 WL 4755175, at *5. As Verra points out, Smith does not suggest "that Verra's system is inaccurate or that the system mistakenly captured an image of

22

[Smith's] car," or any other car. Verra MTD at 12. Instead, Smith merely posits that "thousands of individuals cited under the CrossingGuard System paid the fines not because they were liable, but to avoid the risk and confusion associated with contestation—a process that was not clearly explained, timely available, or easily navigable." Compl. ¶ 45. Despite this purported chilling effect, Smith does not allege that any of those challenges would have succeeded on the merits. Nor does he explain how the NOV administrative hearing procedures would differ from the later-available UTC hearing procedures. And he alleges no deficiencies in the UTC hearing procedures.

Smith's own experience also weighs against him on this point. Believing the NOV was issued in error, he declined to pay, received a UTC, and contested the infraction at a hearing where he was found liable. *Id.* ¶¶ 50–53. Smith does not allege that the UTC hearing outcome was incorrect or that he was unable to appeal had he desired to do so. The NOV thus appears to have sufficiently apprised Smith of his rights and did not cause an erroneous deprivation. To be clear, Smith does not allege that the ultimate finding of liability would have been different had he been offered an initial hearing on the NOV.

Further, the procedures here parallel those available—and sustained as sufficient—in *Worthy*. There, "[a]t the administrative hearing, Phenix City must prove the red-light violation by a preponderance of the evidence. If a citation recipient loses at the administrative hearing, he can appeal to the

23

circuit court, which conducts a new trial." *Worthy*, 930 F.3d at 1223. Here, once an individual declines to pay the NOV and requests a hearing on the UTC, "[a] court that has jurisdiction over traffic violations shall determine whether a violation of this section has occurred. . . . by a preponderance of the evidence." § 316.173(5)(g), Fla. Stat. (2024). If he loses, he may appeal to circuit court. *See* § 318.16(1), Fla. Stat ("If a person is found to have committed an infraction by the hearing official, he or she may appeal that finding to the circuit court."). The Eleventh Circuit has held that, in some contexts, post-deprivation "procedure satisfies due process because the Florida Circuit Court has the power to remedy any procedural deficiencies and cure violations of due process." *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1379 (11th Cir. 2019); *see McKinney*, 20 F.3d at 1557 ("[T]he state may cure a procedural deprivation by providing a later procedural remedy.").

Ultimately, both here and in *Worthy*, the alleged violator may challenge the infraction on the merits at two different points: once before appealing to the circuit court, and again on appeal, which independently may cure constitutional error. *See Club Madonna*, 924 F.3d at 1379. The only difference is that the defendants' CrossingGuard System and procedures permit an additional, preliminary offramp—prepayment (in a lesser amount) at the NOV stage. Smith does not persuade that the defendants' preliminary allowance, or notice thereof, significantly increased the risk of erroneous deprivation.

24

### 3. Government Interest

Lastly, "[a]s to the final *Mathews* factor, [the government defendants] undeniably ha[ve] an interest in the efficient resolution of disputes concerning [school bus traffic] violations," as well as the protection of school children through the enforcement of traffic laws. *Worthy*, 930 F.3d at 1224. Smith does not seriously dispute this point but argues that the interest would be "served by accurate enforcement of school bus safety laws; not by a system structurally designed to deter contestation through unnecessary escalation." Resp. at 14. But again, Smith does not articulate that the defendants' "deterrence" efforts resulted in an increased number of erroneously issued citations.

Additional procedures would also burden the defendants "without providing any meaningful advantages to citation recipients," who may already receive a full UTC hearing if desired. *See* Verra MTD at 13. On this point, the *Worthy* court explained that "the additional procedures Appellants ostensibly seek—requiring that Phenix City immediately provide a full judicial hearing, prove violations of the civil ordinance beyond a reasonable doubt, and not collect any fee to appeal—would place an enormous burden on the city" and "would also encourage frivolous appeals and dilatory tactics by citation recipients." 930 F.3d at 1224. So too here, where Smith does not plausibly allege that he or anyone else had meritorious grounds for contesting an NOV.

25

Despite this, Smith avers that "[a]dditional safeguards would have been neither burdensome nor novel" because Florida now requires that the defendants provide hearings at the NOV stage. Resp. at 13–14. But that the legislature amended the statute to require NOV hearings does not mean that the defendants, on their own initiative, needed to provide those same procedures absent a legislative mandate. Nor does it mean that doing so is not burdensome for the defendants. *See, e.g.*, *Parker*, 2015 WL 4755175, at *5 ("Local Governments would be 'greatly burdened' if they were required to conduct a formal hearing every time a ticketed diver sought to contest his or her ticket." (quoting *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 149 (4th Cir. 2014)). More broadly, I cannot presume that the Florida legislature amended a statute because the procedures it provided were unconstitutional. *See, e.g.*, *United States v. Tapert*, 625 F.2d 111, 121 (6th Cir. 1980) ("An amendment to an existing statute is not an acknowledgment by Congress that the original statute is invalid. It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws."). Absent allegations that additional safeguards would decrease the number of citations issued (or penalties collected) in error, this factor tilts in the defendants' favor.

Simply put, the defendants did not (and could not) deprive Smith or others of a protected property interest based on the NOV alone. To truly coerce

26

payment or impose further fines, penalties, or restrictions on a violator's driving privileges, the defendants were obligated to (and did) issue Smith a UTC and provide him a hearing. The UTC contestation procedures carry the hallmarks of adequate process, including the ability to submit an affidavit, request a hearing, and appeal an unfavorable hearing determination. Smith therefore fails to state a constitutional violation of his procedural due process rights.[5]

### D. Unjust Enrichment

Each defendant moves to dismiss Smith's claim for unjust enrichment on different grounds. First, the Sheriff's Office avers that an unjust enrichment claim "is based on an implied contract," and Florida has not waived its immunity for quasi-contractual claims. *See* Sheriff's Office MTD at 13–14. Next, the School Board argues that Smith's claims are barred by the voluntary payment doctrine. *See* School Board MTD at 8–10. Finally, Verra contends that the unjust enrichment claim is duplicative and premised on "misconduct." Verra MTD at 20–22. Only the Sheriff's Office's argument persuades.

---

[5] Because Smith fails to state a claim for a violation of the Fourteenth Amendment, I do not address the defendants' remaining arguments that they are entitled to qualified immunity under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), that Verra is not a state actor for purposes of Section 1983, or that Smith's constitutional claims are barred by the voluntary payment doctrine.

"Under Florida law, unjust enrichment claims require that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knows of the benefit and voluntarily accepts and retains it; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit." *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1359 (M.D. Fla. 2021). "A claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999); *see Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*, 370 So. 3d 1010, 1016 (Fla. 5th DCA 2023) (describing unjust enrichment as a "quasi-contract" obligation "created by the law to remedy the unjust retention of a benefit conferred by another") (citation modified).

### 1. Sovereign Immunity

The Sheriff's Office maintains that sovereign immunity insulates it from Smith's unjust enrichment claim. *See* Sheriff's Office MTD at 14. Although some Florida courts have described sovereign immunity as an affirmative defense,[6] it may be considered on a motion to dismiss so long as "the complaint conclusively establishes its applicability." *Miami-Dade County v. Perez*, 343 So.

---

[6] Florida courts—even the same District Court of Appeal—appear to disagree with the affirmative defense characterization. *See, e.g.*, *City of Miami v. Robinson*, 364 So. 3d 1087, 1091 (Fla. 3d DCA 2023) ("Much like subject matter jurisdiction, sovereign immunity isn't an affirmative defense, and it can be raised at any time.").

3d 175, 177 n.2 (Fla. 3d DCA 2022); *see also Dist. Bd. of Trs. of Miami Dade College v. Verdini*, 339 So. 3d 413, 417 (Fla. 3d DCA 2022). "In Florida, sovereign immunity is the rule, rather than the exception." *Rojas v. Univ. of Fla. Bd. of Trs.*, 419 So. 3d 593, 599 (Fla. 2025) (per curiam) (citation modified). Accordingly, "[t]he immunity of the State of Florida and its agencies from liability for claims arising under Florida law or common law is absolute absent a clear, specific, and unequivocal waiver by legislative enactment." *State, Dep't of Elder Affairs v. Caldwell*, 199 So. 3d 1107, 1109 (Fla. 1st DCA 2016) (per curiam). Thus, because Florida has not expressly waived its immunity for equitable claims, *see* § 768.28(1), Florida Statutes, "the state continues to enjoy sovereign immunity from quasi-contractual claims such as unjust enrichment." *Heine v. Fla. Atl. Univ. Bd. of Trs.*, 360 So. 3d 412, 420 (Fla. 4th DCA 2023) (citation modified); *Calderone v. Scott*, No. 2:14-cv-519, 2015 WL 1800315, at *2 (M.D. Fla. Apr. 16, 2015) (same).

Smith does not challenge the caselaw weighing against him, but instead responds that "[d]isgorgement of funds wrongfully obtained is not the same as enforcing an implied contract against the State." Resp. at. 28. Smith provides no support for the idea that Florida's sovereign immunity applies to certain subsets or theories of unjust enrichment claims and not others. And while a limited number of courts have permitted claims to proceed against the State for "unlawful monetary extractions," *Parker,* 2015 WL 4755175, at *4, those

29

decisions concerned the state entity's "refusal to obey a direct legislative mandate resulting in the payment of an illegal fee," *Lee Mem'l Health Sys. v. Hilderbrand*, 304 So. 3d 58 (Fla. 2d DCA 2020) (quoting *Parker*, 2015 WL 4755175, at *4) (citation modified). Smith does not allege that the Sheriff's Office violated the authorizing statute here, and I have already determined that Smith does not allege a federal constitutional violation. Ultimately, Smith does not explain how "equitable relief directed at preventing retention of an unjust benefit," *see* Resp. at 28, deviates from the core of an unjust enrichment claim, which is a "fiction . . . adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997) (en banc), *as modified on clarification* (June 4, 1997). That is precisely what Smith's complaint alleges. *See* Compl. ¶¶ 104–05. Smith's claim for unjust enrichment against the Sheriff's Office is dismissed with prejudice.[7]

---

[7] In reaching this conclusion, I note that Smith never contests that the Sheriff's Office qualifies as a subdivision of the State for sovereign immunity purposes. *See, e.g.*, *Weiland*, 792 F.3d at 1330 (applying Florida's statutory sovereign immunity to a county sheriff's office). Although Florida's sovereign immunity presumably applies with equal force to the School Board, as a subdivision of the State, the School Board never raised or argued it. Accepting the treatment of sovereign immunity as an affirmative defense, I do not raise it on the School Board's behalf.

### 2. Voluntary Payment Doctrine

Next, the School Board moves to dismiss Smith's unjust enrichment claim as barred by Florida's voluntary payment doctrine. *See* School Board MTD at 8. Concerningly, however, the School Board misrepresents caselaw and, in other instances, cites cases that the Court cannot locate.

Florida's "voluntary payment doctrine provides that 'where one makes a payment of any sum under a claim of right with knowledge of the facts, such a payment is voluntary and cannot be recovered.'" *Ruiz v. Brink's Home Sec., Inc.*, 777 So. 2d 1062, 1064 (Fla. 2d DCA 2001) (quoting *City of Miami v. Keton*, 115 So.2d 547, 551 (Fla. 1959)). The voluntary payment doctrine is an affirmative defense that should not be reconciled on a motion to dismiss, *Schojan v. Papa John's Int'l Inc.*, 34 F. Supp. 3d 1206, 1210–11 (M.D. Fla. 2014), unless "the complaint shows on its face that the defense applies." *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 978 (11th Cir. 2015) (per curiam). Smith alleges that the defendants "coerced payment by discouraging or deterring exercise of procedural rights, and failed to provide clear, accessible, or timely opportunities to contest liability before penalties accrued." Compl. ¶ 105; *see also id.* ¶¶ 45–46. On those allegations, I cannot conclude that Smith made his final payment "with full knowledge of the material facts." *Schojan*, 34 F. Supp. 3d at 1211.

31

Although the School Board's argument fails on its own terms, I note that its brief misrepresents multiple cases and hallucinates others. First, the School Board claims that the Eleventh Circuit in *Pincus v. American Traffic Solutions, Inc.*, 25 F.4th 1339 (11th Cir. 2022) (per curiam), "reaffirmed that Florida law bars unjust enrichment or other equitable recovery where the payer knowingly elects to pay rather than pursue available alternatives." School Board MTD at 8. But *Pincus* affirmed dismissal of an unjust enrichment claim "because [the defendant] had given [the plaintiff] value in exchange for the fee," and thus "it was not inequitable for [the defendant] to retain the fee," not because of the voluntary payment doctrine. *See* 25 F.4th at 1341 (citation modified). In fact, *Pincus* does not discuss the doctrine at all. Second, the School Board cites two cases that do not appear to exist: *Abreu v. City of Miami Beach*, 2021 WL 3625049 (S.D. Fla. Aug. 16, 2021), and *Gonzalez v. City of Coral Gables*, 2018 WL 2392077 (S.D. Fla. May 25, 2018). *See* School Board MTD at 9. Finally, the School Board represents that two different district court decisions from the Eastern District of New York "apply the same rule" as *Pincus* regarding Florida's voluntary payment doctrine. *See id.* One of the cited cases, *Morgulis v. BusPatrol Am., LLC*, 2020 WL 1923164, at *8–9 (E.D.N.Y. Apr. 21, 2020), does not exist as cited. *Id.* Even presuming that the School Board intended to cite a different case of the same name from the *Southern* District of New York, that case discussed the voluntary payment doctrine in New York, not Florida.

32

*See Morgulis v. Bus Patrol Am., LLC*, No. 24 CIV. 113 (ER), 2025 WL 1094855, at \*5 (S.D.N.Y. Apr. 11, 2025), *aff'd*, No. 25-1224-CV, 2026 WL 603607 (2d Cir. Mar. 4, 2026). The same is true for the Eastern District of New York that the School Board cites. *See Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 228 (E.D.N.Y. 2015).

Misrepresenting caselaw and citing to non-existent cases is a violation of the Local Rules and the rules of professional conduct. *See* Local Rule 2.01(e); Florida Bar Rule 4-1.1; Florida Bar Rule 4-3.3; Florida Bar Rule 4-8.4. In the light of the above erroneous citations and misrepresentations, no later than May 12, 2026, lead counsel for the School Board is ordered to show cause as to why the Court should not refer the matter to the Florida Bar or otherwise impose sanctions under Federal Rule of Civil Procedure 11(c).

### 3. Verra's Arguments

Lastly, I turn to Verra's claims that Smith's unjust enrichment claim should be dismissed because it is duplicative, is predicated on wrongdoing, and because Verra provided consideration to the other defendants. *See* Verra MTD at 20–22; Reply (Doc. 47) at 7. Verra fails to persuade on each argument.

First, although Verra is correct that Smith's allegations pertinent to the unjust enrichment claim overlap with the factual predicate for his constitutional claim, so long as Smith fairly alleges no adequate remedy at law, he may still plead an unjust enrichment claim in the alternative. *See, e.g.*,

*Salerno v. Fla. S. College*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020). In this instance, Smith could yet prove Verra's conduct was inequitable under Florida law even if he failed to allege that Verra's conduct was unconstitutional.

Next, Verra argues that Smith's unjust enrichment claim fails because "his allegations are premised on Verra's *misconduct.*" Verra MTD at 22 (emphasis added). On this point, Verra's reliance on *Guyana Telephone & Telegraph Company, Limited v. Melbourne International Communications, Limited* is unpersuasive. *See id.* (citing 329 F.3d 1241, 1246 n.3 (11th Cir. 2003)). Although *Guyana*'s dicta purported to distinguish in name between "unjust enrichment" and "wrongful enrichment," *see id.*, "the court did not hold . . . that a plaintiff cannot bring an unjust enrichment claim based on wrongful conduct," *G.L.C. Consulting Servs. 1990 L.T.D. v. Tropicana Prods., Inc.*, No. 8:07-CV-599-T-24MSS, 2007 WL 9723898, at *4 (M.D. Fla. Nov. 19, 2007); *cf. Flint v. ABB, Inc.*, 337 F.3d 1326, 1330 & n.2 (11th Cir. 2003) (distinguishing between the "causative event" of wrongful and unjust enrichment). "Indeed, it appears that no Florida court has ever made this distinction." *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab Inc.*, No. 6:10-CV-1103-ORL-31, 2011 WL 6338496, at *6 (M.D. Fla. Dec. 19, 2011), *aff'd sub nom. State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579 (11th Cir. 2013) (per curiam); *see Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1329 (M.D. Fla. 2017) ("[T]he Court

34

cannot find . . . any Florida legal authority for the proposition that an unjust enrichment claim under Florida law cannot be premised upon wrongful conduct."). I decline to make this distinction at the pleading stage.

Finally, Verra argues that "[b]ecause [it] gave adequate consideration to 'someone' for the benefit conferred, [Smith's] unjust enrichment claim fails." Reply at 7 (citing *Johnson v. Chase Bankcard Servs., Inc.*, 582 F. Supp. 3d 1230, 1236 (M.D. Fla. 2022)). Notwithstanding the limited support for this proposition, I do not consider Verra's argument because Verra raised it for the first time in its reply brief. *See, e.g.*, *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (citation modified). Accordingly, Smith's claim for unjust enrichment against Verra survives.

### E. FDUTPA

Finally, Smith brings a FDUTPA claim against Verra, alleging that "Verra's operation of their CrossingGuard System . . . constitutes an 'unfair,' 'deceptive,' and 'unconscionable' act or practice." Compl. ¶ 117. Verra responds that the claim must be dismissed for two reasons: (1) Smith is not a consumer, and (2) Verra complied with statutory requirements governing the school bus camera enforcement program. *See* Verra MTD at 16–19. I agree.

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat. "To assert a claim under FDUTPA, a plaintiff must allege (1) a deceptive or unfair act in the conduct of trade or commerce; (2) causation; and (3) actual damages." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023). "A plaintiff need not be a consumer to assert a FDUTPA claim," so long as he "prove[s] that there was an injury or detriment to consumers." *Id.* (quoting *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015)); *CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *3 (11th Cir. July 29, 2022) ("[T]he [FDUTPA] plaintiff must allege that the relevant act or practice was harmful to a consumer.").

Verra contends that neither Smith nor any putative class member qualifies as a consumer because they did not purchase goods or services from Verra, and further that "the payment of fines arising from traffic infractions is manifestly not a consumer transaction." Verra MTD at 16–17. Smith protests that this " 'no purchase, no FDUTPA' rule appears nowhere in the statute." Resp. at 24. According to Smith, he need not be a "consumer" or "purchaser." *See id.* It is enough that "Verra operated a standardized notice-and-payment apparatus designed to drive collections through its portal by leveraging governmental consequences," i.e., "conduct 'in trade or commerce.' " *Id.*; *see*

Compl. ¶ 29 (alleging that Verra's website, referenced on the NOV, "functions as the exclusive online portal through which motorists are directed to view video evidence, pay penalties, or access FAQs"). Smith's formulation is overbroad.

Even where the conduct is "in trade or commerce," Smith must allege that *a consumer* was harmed. In the FDUTPA context, a " 'consumer' simply means a purchaser and consumer of goods or services." *State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC*, No. 8:21-CV-239-TPB-AEP, 2024 WL 4349246, at *5 (M.D. Fla. Sept. 30, 2024) (citing *Whertec, Inc. v. Salmon*, No. 3:20-cv-1254-BJD-PDB, 2021 WL 3555676, at *6 (M.D. Fla. Apr. 28, 2021); *cf. Marfut v. City of North Port*, No. 8:08-CV-2006-T-27EAJ, 2009 WL 790111, at *8 (M.D. Fla. Mar. 25, 2009) (noting that, in the FDCPA context, "[f]ines are not considered debts . . . because they are not the product of a consumer transaction"). In other words, a consumer is "[s]omeone who buys goods or services for personal, family, or household use, with no intention of resale." *Consumer*, BLACK'S LAW DICTIONARY (12th ed. 2024). To that end, the "measure of actual damages under the FDUTPA is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Tri–County Plumbing Services, Inc. v. Brown*, 921 So.2d 20, 22 (Fla. 3d DCA 2006) (citation modified). The "market

value" calculation contemplates the availability of a product or service for purchase, and quantifiable harm to a consumer in purchasing it.

Here, though, Smith only alleges that "Verra engaged in trade or commerce by offering services that included the design, implementation, and administration of a citation enforcement and payment system through which civil penalties were collected." Compl. ¶ 118. Smith does not allege that he or any putative class members purchased those "services" from Verra, or that they were harmed in doing so. Nor could he—the defendants' imposition and collection of statutorily required traffic violation fines does not resemble a consumer transaction in which a consumer selects a product or service from a marketplace.[8] Accordingly, Smith fails to allege a claim for violation of the FDUTPA.

Even were Smith's commercial transaction theory correct, I agree with Verra that Smith's claim is independently barred by FDUTPA's "safe harbor" provision, which excepts from the statute's purview "[a]n act or practice required or specifically permitted by federal or state law." § 501.212(1), Fla. Stat.; *see* Verra MTD at 17–19. "The purpose of the safe harbor provision is

---

[8] To be sure, at least one federal court has permitted plaintiffs who paid unlawful traffic fines to a third-party service to bring a FDUTPA claim. *See Parker*, 2015 WL 4755175, at \*3. There, however, some of the ticketed drivers "paid a convenience fee to use these services," which existed within "a marketplace for drivers who believed they owed money to satisfy unlawful fines." *Id.* Even assuming that *Parker* was correct in its broad interpretation of FDUTPA's scope, the defendants' system here does not mirror the alleged "marketplace" at issue there.

38

obvious: it would be unacceptably inconsistent for one statute to penalize conduct mandated elsewhere." *Young v. Cmty. Health Sys., Inc.*, No. 8:22-CV-329-SCB-AEP, 2022 WL 18495250, at \*5 (M.D. Fla. Sept. 16, 2022) (citation modified). Likewise, "Florida courts have treated this so[-]called 'safe harbor' as prohibiting a plaintiff from using FDUTPA to create new obligations, or to broaden existing obligations, when a defendant's conduct is already in compliance with" state law. *Young v. Cmty. Health Sys., Inc.*, No. 22-14255, 2023 WL 6121795 (11th Cir. Sept. 19, 2023) (per curiam) (collecting cases).

Smith does not allege that Verra failed to comply with state law, which authorized Verra "to install a school bus infraction detection system" to "increase public safety," and to submit to law enforcement images and video from its cameras. *See* § 316.173(1)(b), (4), Fla. Stat. (2024). In turn, law enforcement sends an NOV that must contain, among other things, images of the violation and "[a] warning that failure to pay the civil penalty or to contest liability within 30 days after the notice is sent will result in the issuance of a uniform traffic citation." *See id.* § 316.173(5)(a)–(g). As Verra explains, Smith "does not allege the NOV he received failed to provide him with all the information the [statute] requires." Verra MTD at 18. Instead, Smith claims that "Verra structured the NOV and related communications to induce payment . . . while failing to clearly disclose a critical limitation—no contest at the NOV stage." Resp. at 24. Importantly, though, Florida neither required the

NOV to "disclose [that] critical limitation," *see id.*, nor did it impose the specific formatting Smith desires, *see* Compl. ¶¶ 2, 40 (complaining that "[t]he only reference to a hearing is placed on the reverse side of the document"). Because Smith's FDUTPA claim attempts "to create new obligations, or to broaden existing obligations" under Florida's then-operative statutory scheme, it is barred by the safe harbor provision. *Young*, 2023 WL 6121795, at *3. Count V of Smith's complaint is therefore dismissed with prejudice.

## IV.    CONCLUSION

Smith's putative class action complaint fails to allege that the defendants' operation of a school-bus camera traffic enforcement system violated his constitutional right to due process. Although Smith could not readily contest the initial notice of violation, the defendants provided Smith and the putative class members with constitutionally adequate contestation procedures and notice thereof. Smith likewise fails to state a claim for violation of FDUTPA against Verra because he does not allege consumer harm. Finally, although sovereign immunity bars Smith's unjust enrichment claim against the Sheriff's Office, at this stage Smith sufficiently states a claim for unjust enrichment against Verra and the School Board. Accordingly, it is **ORDERED:**

1. The Polk County Sheriff's Office's Motion to Dismiss (Doc. 30) is **GRANTED**. Counts I, II, III, and IV of the Complaint are **DISMISSED WITH PREJUDICE** as against the Sheriff's Office.

40

2. The Clerk is directed to **TERMINATE** the Polk County Sheriff's Office from this action.

3. The School Board of Polk County's Motion to Dismiss (Doc. 31) is **GRANTED IN PART** and **DENIED IN PART.** Counts I, II, and IV of the Complaint are **DISMISSED WITH PREJUDICE** as against the School Board.

4. Verra Mobility Corporation's Motion to Dismiss (Doc. 33) is **GRANTED IN PART** and **DENIED IN PART.** Counts I, II, IV, and V of the Complaint are **DISMISSED WITH PREJUDICE** as against Verra Mobility Corporation.

5. The School Board and Verra must file an answer to the Complaint no later than **May 12, 2026.**

6. No later than **May 12, 2026**, lead counsel for the School Board is ordered to show cause why the Court should not impose sanctions, or refer the matter to the Florida Bar, based on the misrepresentations and citations to non-existent cases included in the School Board's motion.

**ORDERED** in Tampa, Florida, on April 28, 2026.

Kathryn Kimball Mizelle
United States District Judge